Good morning, Your Honors. My name is Kara Carlson. I'm with the Arizona Attorney General's Office representing Arizona Secretary of State Adrian Fontes. We would like to reserve about five minutes of our time for rebuttal. Thank you. This case is fundamentally about three people invoking the machinery of the state to obtain the benefits of a political party without following the laws that govern political parties in Arizona, and then wielding that lopsided power against 30,000 No Labels members and at least five No Labels candidates. The group of people who assert they act on behalf of No Labels in this instance, which I will refer to now as the committee, had a vision for their associational rights. That vision included becoming a political party pursuant to Arizona Revised Statute 16801. In other words, their own conception of how their freedom of association could best be exercised, included intentionally and knowingly, invoking the machinery of the state to form a political party. Counsel, I guess something I was curious about, I was looking at the record, I couldn't really find it. Did the party, before the party acquired the requisite signatures to become a party under the Arizona law, did No Labels advertise its lack of a desire to have down-ballot candidates? Did they advertise that? No, it came as a surprise to the Secretary of State, for instance, when they received the correspondence that even though No Labels decided to become a political party, they had no desire to participate in the democratic process. Were they required to provide that information, though? There's no law requiring them to provide that information. There's no law regulating how someone goes about deciding when they are choosing how to exercise their associational rights, whether they should become a political party or not. However, once they invoked that machinery of the state, they were then bound by those laws. And all those laws, again, existed when they made that choice. But then, after they became a political party, after they got the signatures, then it was at that point that the committee then decided? It was months afterwards. The committee was formed in August, and that was when the committee created their bylaws and said that they determined that they would have no other candidates participate in the election. Now, I understand that my friend on the other side has referenced letters that were sent to the Secretary of State asserting that they didn't want to do this, but there was, again, there was no state party infrastructure. There were no bylaws. There was nothing other than a letter from a law firm asserting that this is what the party wanted, or the party, you know, the committee members, or at least the people who would eventually appoint the committee members, wanted to do. And how was the public informed of that desire? They were not.  Ms. Carlson, I guess I don't take your no labels to be making any argument that there is anything special about the unique national interests with respect to presidential elections, but you can see that, you know, parties get formed all the time, and no labels was entitled under controlling Supreme Court precedent to drop in whatever presidential and vice-presidential ticket the national chose without regard to what the state party decided, right? Correct, but that's not, you know, the issue that's being challenged here. The issue that's being challenged here is you had three people who were the committee asserting to act on the behalf of no labels against at least five candidates that we know of who were no labels members, and however many, you know, 30,000 roughly, I mean, the precise number is in the record, but, you know, approximately 30,000 people at the time of the general election who weren't allowed to participate at all. Well, could, I think courts, I'm not sure that our court has seen it, but courts have held various ideological litmus tests for membership, and I think in the Alaska Party case, actually, we said that there was no such issue presented there, but couldn't know labels have had a platform and required that its members agree to that platform just as the Alaska Independence Party had a platform, and that that platform says I am committed to only running as a presidential or vice-presidential candidate of the party or not at all? I think that no labels could have done that in another association, but the issue is when they chose to become a political party, they got certain benefits. They received ballot access. They received, you know, ballot access in the way you're talking about, the opportunity to select a president and a vice-presidential candidate to get inserted at a time later that served their interests. But they don't want those benefits, and typically when a party comes to us, it's difficult because you have leadership and membership, and the leadership is the one who's hired the lawyers and are showing up here, but typically in expressive association cases, we take whatever the leadership asserts its interests and its expression to be as a given, that that's its position, and so that the outliers are these candidates, not the leaders. But this is not a typical association case. This is a ballot access case. This is an Anderson Burdick case where you have to weigh the state's interest in having organized elections against and voters' interests in participating as a member of No Labels against the, you know, the committee's asserted interests, and again- Well, here though, the district court found that the state's interest was minimal. Was that an error? Yes. How, and in what way, and what's your best case establishing that? Probably Arizona Libertarian Party. In Arizona Libertarian Party, you had the Libertarian Party deciding that they wanted to restrict their, who their candidates could collect signatures from to be only libertarian members, not libertarians and independents. Well, when they did that, that threshold for ballot access for libertarian candidates went from a constitutional minimum of somewhere between, you know, a fraction of a percent and two percent, depending on the office sought, and it skyrocketed to 11 percent to 30 percent. That would be absolutely unconstitutional. But this court held that the state was not forcing them to make that choice. They had, that was a choice that they were making. That was a choice that the party was taking on. And the same here. They made the, No Labels made the choice to become a political party. With that choice, there was this whole structure of different laws and regulations, because you're also, you're affecting other people's rights. I mean, just think of it in, you know, if we look at it in a democratic way, and the state is permitted, and it is an important interest under controlling Ninth Circuit and Supreme Court, there are other means under the bylaws. And, of course, under you, there's only so much the state can do to control those internal procedures. There are internal procedures for those members to be heard. Maybe not right before they want to file, but there is some, at least, basic responsiveness, is there not, to the membership of the leaders? It is extremely limited under the bylaws, because they have to, you know, it's only by consent of the members that they may have a, convene a convention. But more importantly, by putting out, by getting ballot access on the public ballot, right? We are talking about the public ballot. The public has an interest here, because they chose to invoke that machinery. They could have very easily maintained their own, you know, association, decided we only want this person or another to run. That's it. We don't want to run for any other office. We don't want to water down our brand at all. We don't want to, we don't want to have, in their terms, Mother Teresa run as our, as our nominee. And so, we are going to run, and under Arizona law, they could still do that. What case have we, in what case have we said that independent status is a sufficient substitute for a party label? There isn't any, but in this case, the committee is overriding the will of the party, when the state... No, there's no, where in the record do you have some indication, one way or the other, that the membership, as opposed to, we've got five candidates on one side, three party leaders on the other. It's not much to go on. Right, but we at least know that there were three members of No Labels who said one thing, and there were five members of No Labels who said another, and we're dealing with a public party. So, in my mind, the state has an interest in ensuring that those decisions are made in a democratic manner. And I want to, oh, go ahead. One of the state interests that you assert is the prevention of voter confusion, and I'm just wondering what's so confusing about what No Labels proposes to do. I don't, I'm not sure I follow. Go ahead. Well, there are a couple issues that arise there. The first one was obviously to become a party. They went out and they collected signatures from 50,000 people, and it ended up being like 41,000 valid Arizona voters, to become a political party. On that petition, one of the lines they had to fill out was that they were going to participate in the 2024 primary, which they did not do. They received blank ballots because other Arizona law, when people are, for example, early voters, they are entitled to receive a ballot. And so all of these other statutes then are triggered. And again, this goes back to once you invoke the machinery of the state, there are all these other interests that cascade down. There's a state statute that requires if a party is entitled to representation, each party in Arizona gets a different primary ballot, which means that there were certain No Labels voters who were entitled to vote in a city, a nonpartisan primary. So they received a ballot with their city races, but nothing for No Labels, even though it was a No Labels ballot. You had other No Labels voters who received an entirely blank ballot. You had the people who had to design, test, and print and mail at state expense these ballots to voters. And so I just think that the, and just the common understanding of what a political party is. The political party exists to allow voters to come together, voters to come together, individuals to come together, and to act in furtherance of their political ideology. Counsel, I'm sorry, go ahead. No, go ahead. Well, going to Judge Thomas' question, though, in terms of the confusion, one of the things that you point out in the argument in your papers is that if, for example, in 2026, these individuals would get a blank ballot again because there is no primary, is that correct? And what would happen in 2028 for these individuals? Because now, at that point, they wouldn't have voted for the 2024 election, obviously nothing for the 2026. What would happen to them in the 2028? Right now, it is, we don't have the data to know yet exactly what would happen because their voter registration membership is right on the cusp of being a party entitled to continued representation on the Arizona ballot. So this might be a situation that continues into perpetuity, and this is a big issue. The other state interest that was, did that answer your question before I go on? Sort of. So are you saying that, let's assume that the party continues. In 2028, what would happen to the voters? That's what I'm interested in. What's going to happen to the voters? Are they going to be receiving a ballot that's blank? Yes, they will continue receiving ballots that is blank unless, apparently, the party, under the current regulation, unless the party changes its bylaws. Well, let me back up a little bit. Or are they not going to receive a ballot? Because as I understood your argument in your papers, Arizona has a law that indicates that if you fail to vote in two, I think, elections, that there's an issue with those individuals, that they would be taken off of certain roles. Is that incorrect? No, that is correct. You could lose your ability to be on the active early voter list if you don't vote in one election in those cycles. So would that happen to the people in 2028? Yes, it could. We do not have the data yet. Obviously, 2028 is in the future, but it absolutely could. And that is one of the many, many other issues that has been created here. Ms. Carlson, what about, so I understand Arizona has at least some partisan elections for judicial offices. What if there was a law and justice party that, in its bylaws, and required, just like the Alaska Independence Party did, that its members subscribe to a tenant that they want to separate politics from the law, and so they are only going to run people in these judicial races. And in order to be a member, you have to forswear running in any other race. That's their central expressive association. That's why they exist, and it completely defeats that purpose to have people running in other offices. Can they not do that, and do they not have a right to do so in Arizona? Well, Arizona doesn't have partisan judicial races. We do have, you know, direct election of judges. I think maybe some JP offices here and there, but assume they do. Okay, I can, and that's what my next point was. I could answer that question. They could limit, what the answer to that question is to participate in democracy and to defeat those candidates. That is the answer. How does that work? So they appear on the primary ballot. You have a law and justice party member who appears on the primary ballot for a partisan election, like governor or attorney general, and how do they defeat that person? Because if that person gets one vote and none of the other party members vote for that person, that person advances to the general election on the law and justice ticket, right? Well, you would run, you could run someone else. I mean, that is the answer, is to run someone else. We had a situation. Running for an office that they are opposed to, just like here. I think that's the problem, right? You can't do that by defeat. You've still got a candidate for an office that your core expressive association is not to run in. Right, but the answer is to not become a political party, to have your association in another manner that the state does not regulate and does not have an interest in regulating, that the Supreme Court has repeatedly upheld. I'm down on time, so I want to reserve. Okay, do either of you have any other questions now? Okay, we'll put four minutes on the clock for rebuttal. Thank you. Thank you. Mr. Pappas, when you're ready. Thank you. Good morning, Your Honors, and may it please the Court. I am Andrew Pappas on behalf of the No Labels Party of Arizona. Your Honors, let me begin where Ms. Carlson left off with Judge Johnson's hypothetical about the law and justice party. Our position, of course, is that party absolutely has an expressive right to decide the structure of the association that best enables it to pursue its political goals, because that's what the Supreme Court said in Yu. That's what the Supreme Court said in Toschean. That is the right that No Labels is trying to vindicate here. But so here's a twist from that hypothetical that I don't think applies to you. You gathered 50,000 signatures under a state-approved form that you didn't challenge that promised these voters a primary, and you didn't give them a primary. And it wasn't only until after you organized in August, several months after your recognition, that you decided to change your expressive beliefs. And I don't think you changed it in a way to say that in order to be a member, you have to subscribe to president and vice president in the way that the Alaska Independent Party did. Did you? I mean, you don't have that litmus test that whether or not it's required or permitted by Arizona law or the Constitution, you don't have that here. So as an initial matter, Your Honor, I don't think that the Supreme Court's case law requires that sort of unique ideological test in order for a party to vindicate its associational rights. But in terms of the other questions Your Honor asked, with regard to the new party petition form, No Labels used a form that was prescribed by the Secretary. It did not promise anyone that it was going to participate in a primary election. It used the form that parroted the statutory language in order Why didn't you challenge it at that point? I guess the concern here is that there's a bait-and-switch of the voters, that the form which you didn't challenge, you gathered the signatures under that, and there's nothing in the record to tell us anything else about these 40,000, 50,000 voters in Arizona, except that they subscribed to this form that said there shall be a primary election. Well, it's true that there's nothing in the record, but I don't think the absence of those of that factual record could in any way doom the party's associational rights. Moreover, the Supreme Court has been clear in cases like you that a party does not consent to the violation of its constitutional rights. And that's what we're talking about here, is the vindication of the party's constitutional rights. Now, Judge Mendoza asked the question about when it was that No Labels made this organizational choice. And that's not in the record either, Your Honor. But what is in the record is that as early as June, more than seven — June of 2023, more than seven weeks before the first statement of interest was filed by any purported No Labels candidate, the party informed the Secretary of State that would — that — to confirm that it would only be seeking the offices of President and Vice President and would not be running candidates for any down-ballot races. Counsel, here we — we're having to determine what the burden is on the — on the party, right? One of the things — and I'm playing Anderson Burdick. We have to figure out what the burden is. One of the — one of the things, I guess, I'm — I'm wondering is whether or not the Alaska case doesn't actually answer this particular question in terms of the burden to the party, this associational — associational rights burden that you've indicated. There, we said that we are skeptical that such a conflict imposes a severe burden on the party's associational rights. We said, instead of having its nominee selected or screened by party leadership, the party's nominee is selected democratically by registered party voters. The burden on the party's associational right is further lessened because the Supreme Court has long protected the party's First Amendment right to state whether a candidate adheres to the tenets of the party or whether the officials believe that the candidate is qualified, et cetera, et cetera. So why can't — I mean, why isn't the burden lessened by the fact that you all can go out, put out a statement saying, hey, by the way, these candidates were not — they're not — they're not really part of our — our party. We're — we're distancing ourselves from them. Why isn't that sufficient in this burden analysis? Well, First General, Alaska Independence Party is distinct from this case in — in important ways. The first and most important way is that in that case, the parties already had decided to nominate candidates for office. Their bylaws authorized it. This case deals — and what they were trying to do was prescreen the pool of candidates, as — as in the passage that Your Honor read. They're trying to prescreen candidates to — to narrow the — the ultimate choice. That's not what we're talking about. Right. But there — I guess I understand your point. But I'm — I guess what I'm saying is, why — why isn't the burden that you're saying that you have in this situation lessened, given the fact that you're still able to come out and say, hey, those folks, they're not part of the party? As the official party coming out making a statement saying that. Well — well, I think, Your Honor, because it — it would necessarily divert No Labels Arizona from its message, if the message on the one hand is our whole organizational purpose is to run a unity ticket for president and vice president, and then to say, on the other hand — now, we understand there are these other candidates out there who are trying to run for office with our party insignia, and we have to distance ourselves from them, we have to devote resources. And I'll point out, Your Honor, that the Secretary stipulated — I guess I wonder why — why this isn't the kind of top-down decision-making that we said in — in AIP that — that can be prevented. I mean, why don't No Labels party members get a say in what offices the party fulfills? Why can that be in the hands of just three — three people when, you know, here at least we know we have five other people? Well, so I don't think that that sort of numerical comparison is — is available here, for the reason that those three people that — that Ms. Carlson has referred to as the committee do speak for the — the party through its bylaws, through the party's own internal organizational structure. But they were never informed of that when you obtained the signatures, were they? Your Honor, I — there is nothing in the record on that point. I can tell you that — that — Well, is there something in the record saying that you informed them? There is — there is nothing on the record one way or the other. This case was tried on stipulated facts in — in order to — to get it tried on an expedited basis. But — so there's nothing in the record on that point. But again — The first time the State was informed that No Labels didn't wish to fill any other offices was — it was after the party was formed. The first letter that's in the record is the June — I think it's June 2nd, 2023 letter that the party sent to the Secretary of State. Now, they've suggested — or they've tried to insinuate that the committee doesn't speak for the party. But, Your Honor, they — the Secretary of State accepted the party chair's representation in a letter that the party was not going to participate in the presidential preference election. That was the mechanism by which the party informed the State that it was not going to participate in the PPE, but is instead going to choose candidates through a  So the idea that they'll accept the party chair's representations for some purposes, but not others, I think, is entirely undeniable. Yeah, but I guess back to my question, which I think you — you were trying to answer, is — I mean, it — it — it does seem a little bit akin to me to — to Alaska Independence Party, in the sense that — that the party members here are being deprived of the opportunity to say, hey, here's how we want our party to look. It seems to me that under our precedent, Supreme Court precedent, that what the State can't do is govern your internal affairs. But we're talking about it here, about the voters' rights. So — So, Your Honor, a few responses. The first is that the party's core associational purpose in this instance was to put forward a unity ticket for president and vice president and not to run candidates for any other office. And so it interferes with the party's message. And it forces the party to allocate resources differently. Well, here's the thing. I — you mentioned that — you mentioned it in argument now twice, and you mentioned it in your papers. Where in the record have you indicated what — what that expense is, what that — what those resources are? Have you quantified that in the record? Because I haven't found that. Your Honor, it's not quantified in the record, but the Secretary of State stipulated — he did not contest that No Labels Arizona would have to stray from its objectives and allocate resources differently if it were forced to nominate candidates for office — offices that the party was not seeking. This is a 2ER-099 — 0099. The Secretary stipulated to that. Mr. Bates, could — could No Labels decide that it is only going to run employees of No Labels Incorporated in — in its elections and say that is the definition of our party, that is our core belief? I think that — that could be a harder case, Your Honor. And I could — I could see some independent constraint. I think what we're talking about here goes straight to the party's message and mission. Well, they — they all do. I mean, I guess that's — that's the problem with this case is that we don't have a case out there — let me know if we're missing it — that — that suggests that a party as such gets to pick and choose the offices for which it runs. And — and to the extent — so your rights there are derivative from a general expressive association right to define your party's platform and — and message. But — but I — we don't have any cases that tell — and there — there are some cases, although not in our court, with respect to some particularly controversial candidates that parties want to distance themselves from. But no case that — that gives the party leadership a veto over candidates, particularly where we have this recognized right of endorsement or disassociation. But what we're talking about this case — in this case, Your Honor, is not a veto over particular candidates. What we're talking about is a party's institutional decision what offices to pursue in the first place. And that choice has to belong to the party. And where — what's your — what case recognizes that — that that is a definition of a political party? That they get to pick and — that the leadership gets to pick and choose as opposed to the membership? Well, Your Honor, I think political parties get to define themselves under this Court's case law and the Supreme Court's case law. So it would only run no-labels employees. And that doesn't mean that they aren't necessarily subject to — to other legal constraints and other circumstances. And all these cases obviously turn on their facts. But what are those — what are those limits going to be? I mean, can — could no-labels, you know, change its — assume no-labels wanted to run for three offices, but then didn't like the candidate who was running for — the leadership didn't like the candidate running for — for one of those offices. Could it change its bylaws at that point? I think that would be a harder case, Your Honor. I think what we're talking about here, though, is the upstream decision. But why? Why would — why would that be a harder case? Because I think that gets closer into the Alaskan independence territory, where the party is trying to prescreen particular candidates and not choosing the offices it wants to run for. You know, Your Honor's law-and-justice hypothetical, I think, is illustrative. The mine safety example that we provided in the district court, and again here, I think is also illustrative. Imagine, you know, in Arizona we elect a State mine inspector. A party wants to focus entirely on mine safety issues. I think it's easy to see why that party should be able to pursue a narrow-fork focus. But that party didn't exist in Arizona until August, and it was qualified in March. I think that's the basic — these are all hypotheticals that assume that these beliefs existed and were put into practice into bylaws prior to the qualification. You were qualified as a party for a primary, and then, only a few months later, decided maybe you'd put up only presidential candidates. Your Honor, there's — so first of all, there's — there's nothing in the record that suggests that this was some sort of post-hoc determination. It's true that the party got political party status in March, but the Secretary did not stipulate — did not suggest, and in fact stipulate to the contrary, that no labels was established for the purpose of placing presidential candidates. But why — why would the Secretary think anything else? Because nowhere in the history of the reported cases here do we have a party, either in Arizona or elsewhere, attempting to get a ticket to ride for one trip only. Well, I don't — I don't think the Court necessarily wants to inquire into the sincerity of a party's motives. But I think if the Secretary wanted to test that factual — Not that it's sincere or not. It's whether it's your constitutional right. Well, I think if the Secretary wanted to test that factual assertion, the Secretary had the opportunity to do so. He chose not to. Instead, he chose to stipulate that it was our only current objective to pursue the presidency and vice presidency, that to accomplish this objective, no labels wishes not to use its ballot line for the governor's office. But you don't dispute with the timing. You don't — you don't dispute the timeline that it was qualified in March and limited to presidential candidates in August. Well, that is — that is not the timeline, Your Honor. What are we missing from the record? Well, you're — so it is true that the party obtained political party recognition in March. The party first sent a letter to the Secretary in June, sent another letter in August. It sent another letter after that in August. There has never been any — now, it's true that there isn't a — a news article in the record. You know, if the Court thinks that this case needs further factual development to establish that no labels throughout the entire period was seeking the — the offices of President and Vice President, then I suppose the Court could remand for that. Well, it just goes to Judge Mendoza's, I think, question, as I think is pretty important to me, too. It's like, how did the voters know that this was what they were getting into? And the record — all we have in the record is five, three, and then 50,000 saying, we're going to have a primary. Well, as — as Carlson pointed out, there's no requirement under Arizona law that the party communicate with its voters in any particular way. In fact, in you, again, the Supreme Court said the state doesn't get to dictate the way in which a political party communicates with its viewers.  You's different, though. You — they were looking at setting limits on how long folks could be on committees within the party. I mean, they were getting — California was getting really — and I — I — I think how you deal with AIP, to me, seems to be sort of the harder challenge. Now, I grant you, AIP doesn't necessarily answer everything, but — but why isn't that just instructive? And — and on this notion of not having political parties sort of top-down select the individuals and — and not have a democratic process to do so. Well, first, Your Honor, again, AIP is distinguishable in material ways. In that case, the parties have already decided to nominate candidates. The question was whether they could prescreen particular candidates. That is not the issue in this case. No labels Arizona agrees that if it were to nominate — if it wanted to nominate candidates for offices for which a direct primary is required, its candidates would absolutely be required to participate in that primary. This case involves the upstream decision whether to nominate candidates in the first place. And in AIP, the parties already had decided to nominate candidates. You can look at footnote one of that opinion, which points out that the bylaws in that case authorized the parties to seek offices for which they were eligible. This is different. And again, this case doesn't involve the same kinds of philosophical objections that — that AIP involved. This case is simply about the party's core associational right to determine the structure of the association that best allows it to pursue its political goals. Its only political goals, as the parties stipulated, were to pursue the presidency and vice presidency, and the party structured itself to pursue that. I think that the supreme — excuse me, the Seventh Circuit's decision in Schultz is instructive here. Not — not perfectly on point, but instructive here. Because Ms. Carlson has suggested that by invoking the machinery of the State, I think is how she phrased it, the party got this binary choice. Either it could be forced to run candidates for all offices or none. That — that is — that comes awfully close to what the supreme — excuse me, the Seventh Circuit was dealing with in Schultz. And the party doesn't face that binary choice. Judge Johnstone, I think, asked Ms. Carlson the question, which of the cases says that running an independent candidate is an adequate alternative. In fact, the case law says precisely the opposite. Washington State Grange says the opposite. Jones says the opposite. It is not an alternative for the party to simply run an independent candidate who, by words on a ballot, affiliates himself or herself with the party. But I guess one potential key difference with Schultz, and there might be factual distinctions, too, is that that party, once it — it challenged the state law up front. It said, we really — we are a party that wants to run people for a few offices, and we are going to challenge the Illinois law before the qualification process. So that there would be none of this concern about bait and switch with respect to getting qualified first and then saying, oh, well, we're in for this party thing in Arizona. Sign us up. And then a couple months later say, but we want to change the rules. Doesn't that make a difference? This case would be at least a little less hard had you challenged it before you asked these — all these Arizonans to support you in the primary. I don't think so, Your Honor. I don't — I don't — again, under you, the case law is clear that a party does not — does not consent to the violation of its constitutional rights and its constitutional rights that the party is trying to vindicate in this case. The party followed State procedure to obtain ballot access. It didn't make a promise to any voter in that process that it was going to be running candidates for all offices, State, Federal, and so on. And again, what we're talking about here is the party's associational right to make the institutional decision what its political goals are and how best to pursue them. And the State simply doesn't get to micromanage that process. You know, there are other hypothetical situations — I mean, unfortunately, insurance issues have become top of mind for a lot of Californians if — and the State elects an insurance commissioner. If you wanted to have an insurance-only party in this State that focused just on electing a really good insurance commissioner, that should not be any of the State's concern. A party should be able to structure itself in that way. And what the Secretary is suggesting is that new parties that are particularly vulnerable, especially in their infancy, have to be forced to run candidates all up and down the ballot if they want to have ballot access at all. Why isn't it enough? You say that an independent status isn't enough. Why is the Alaska Independence Party solution that I believe we endorsed not enough to say, nope, this is not a presidential candidate, we're not behind this person? Well, so to distance — well, again, that requires the allocation of resources and it requires the party to divert itself from its message — message — I don't think the — these cases speak so much in terms of the allocation of resources as just basically the association or disassociation. So Schultz does specifically talk about the allocation of resources and uses that as a reason why there is such a heavy burden on the party. Well, but in Schultz, I mean, they required people to have a candidate for each and every one of the positions. They were requiring parties. Here, it's sort of the opposite, right? You're saying we don't want any of that. Well, what we're saying in this case, Your Honor, is that like the party in Schultz, this party should not be forced to nominate candidates for offices. Well, but this is not being foisted upon the party by the State. It's the — it's the party voters who want to run for these offices. There were five candidates who filed statements of interest seeking those offices. They do not get to decide — individual party members don't get to decide for the party any more than the Secretary does. I'm saying one individual party member or five individual party members. The party has ordained through its constitution and bylaws what its own decision-making process is. And the State doesn't get to interfere with that under you. Again, this goes straight to the core associational purpose of the party that it has decided to achieve through a particular structure. The structure is unique. I agree. But the party has the constitutional right to make that decision for itself. Okay. Do either of you have any other questions? Okay. Thank you very much for your argument. Thank you. Thank you. I want to start out with a quote from AIP from page 1178 — I'm sorry, the Alaskan Independence Party. I think I heard one of the judges refer to it as AIP as well. Quote, the State's interest in enhancing the democratic character of the election process overrides whatever interest the party has in designing its own rules for nominating candidates. The party may constitutionally be compelled to participate in a primary. That is what Arizona requires of all political parties. The key difference, for example, between Schultz and Arizona law is that in requiring a full slate of candidates, Illinois required — you know, you had every single candidate for every single office had to go through every single process to qualify for the ballot, which included collecting signatures. It included getting people's name out there. So it included — like, it required the party to not only recruit and field and raise money for every single office if it wanted to have any candidate at all. That is not anything like what Arizona is doing here. It is just not applicable. The other thing I heard my friend argue a lot about was that the party would have to divert its message. That is what happens with political parties in the democratic process when you have different people running for different offices. For example, the Green Party in Arizona this year had someone who was absolutely opposed to what the Green Party stood for. They ran, they got on the ticket, and the Green Party came together as a party and ran a write-in to get them on — to defeat that person on the ballot. That is the democratic process. When you choose to become a political party, that — you bring on, you assume those burdens. They assumed whatever burden they have here, knowingly and voluntarily. There were ways for them to exercise it — to exercise their associational rights differently, and they did not avail themselves of that. And it should not now be on the state to have to figure out how we jibe this with equal treatment of other candidates and other parties. Because what if other parties decide, for whatever reason, they don't want to run different races, or they don't want to run certain candidates? We have to look at the rights of voters. We have to look at the expense and the effort that the state has to go through, mandated by state statute. And again, no statute has been struck down here as unconstitutional in this Court as recently as 2019, and Arizona Libertarian Party upheld, in fact, Arizona's ballot access scheme for candidates, and has upheld previously our ballot access scheme for political parties and independent candidates. So when you have all these alternatives, both under Anderson-Burdick and under the winter factors, Arizona's interests override. And that is from this Court and the United States Supreme Court, not from me. Thank you. Thank you. We thank both counsel this morning for their very helpful arguments in this difficult case. We are in recess until tomorrow morning, and this case is submitted. Thank you. All rise.
judges: THOMAS, MENDOZA, JOHNSTONE